## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**TROY ADAMS**
504 22nd Lane NE
Center Point, AL 35215

*Plaintiff,*

v.

**SIG SAUER, INC.**
72 Pease Boulevard
Newington, NH 03801

*Defendant*

**JURY TRIAL DEMANDED**

**Case No. 1:25-cv-00058-JL-AJ**

## PLAINTIFF'S SECOND AMENDED COMPLAINT – CIVIL ACTION

1.      Fed.R.Civ.P. 15(a)(2) authorizes the within Second Amended Complaint because opposing counsel has given its written assent to the Plaintiff's amendment of his pleading.  Exhibit A.

2.      Upon the information discovered through research and document production, the Sig Sauer P320 is the most dangerous pistol sold in the United States market.

3.      Plaintiff was seriously injured and his life changed by the unreasonably dangerous and defectively designed pistol: the Sig Sauer P320.

4.      Plaintiff is one of many individuals, including federal law enforcement agents, police officers, combat veterans, firearms instructors, and other civilians, who dedicated significant portions of their lives to the safe use of weapons, but who were shot and injured by the defective nature of the P320.

5.      Sig Sauer knew, as early as 2016 and possibly earlier, that unintended discharges caused by unintended trigger actuation was a known risk of the P320's design, as testified to by one of the P320's chief designers, Matt Taylor.

6.     Sig Sauer also knew that unintended trigger actuation by a foreign object contacting the P320 trigger could result in an unintended discharge causing death.

7.     Sig Sauer affirmatively told the U.S. Army that its design of the Sig Sauer P320 **_with_** the inclusion of a manual thumb safety would mitigate the risk of unintended discharges caused by trigger actuation.

8.     The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens do not come with a manual thumb safety even as an option.

9.     No Sig Sauer P320s as of the subject P320's manufacture date were equipped with a tabbed trigger safety.

10.    No Sig Sauer P320s as of the subject P320's manufacture date were equipped with a grip safety.

11.    The vast majority of Sig Sauer P320 models sold to law enforcement and law abiding citizens do not come with any external safety even as an option, meaning a safety on the exterior of the gun that prevents or limits unintended discharges.

## PARTIES

12.    Plaintiff, Troy Adams, ("Plaintiff"), is an adult individual, citizen, and resident of Alabama residing at the above-captioned address.

13.    Defendant, Sig Sauer, Inc. ("Sig Sauer" or "Sig Sauer") is a corporation or other business entity with its principal place of business at 72 Pease Boulevard in Newington, New Hampshire 03801, organized and incorporated under the laws of Delaware.

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is perfect diversity of citizenship between the parties.  The defendant is a resident of the state of New

Hampshire. Plaintiff resides in a state other than New Hampshire. The amount in controversy exceeds $75,000.00. The court may exercise personal jurisdiction over the defendant because it is a resident of New Hampshire.

15.     Venue is proper because a substantial part of the acts and omissions giving rise to this action occurred in New Hampshire.

## GENERAL ALLEGATIONS

16.     Sig Sauer designs and manufactures firearms for sale to military and commercial markets throughout the United States and internationally. It markets and sells its products directly and through dealers.

17.     Sig Sauer was formerly known as SIG SAUERARMS Inc. and changed its name to Sig Sauer, Inc. in October 2007. Its Chief Executive Officer at all times relevant to this Complaint was Ron J. Cohen.

18.     The Sig Sauer P320 is susceptible to unintended discharges, meaning instances when a gun fires without user intent, at an alarmingly high rate.

19.     There have been over 150 incidents (and likely multiples more) of the Sig Sauer P320 unintentionally discharging when users believed they did not pull the trigger. Many of these unintended discharges have caused severe injury to the users and/or bystanders.

20.     The vast majority of these users are law enforcement officers, former military personnel, and/or highly trained and practiced gun owners.

21.     At all relevant times, Sig Sauer was acting by and through its employees, servants, and agents, acting within the course and scope of their employment, service and agency.

22.     This action seeks actual, compensatory, and enhanced compensatory damages, and equitable relief, relating to Defendant, Sig Sauer Inc.'s negligence, defective design, and unfair and deceptive marketing practices regarding the P320.

23.     In its "Safety Without Compromise" marketing materials for the P320, Sig Sauer promises:



SAFETY WITHOUT COMPROMISE

We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

24.     Despite this express representation, which Sig Sauer has made for the last several years to the present, the weapon lacks industry-standard safety features and has fired without the user deliberately pulling the trigger many, many times.

25.     Defendant, Sig Sauer, had knowledge long before the sales of the P320s used by Plaintiff that the P320 - its first ever striker-fired pistol - was capable of firing unintentionally due to defective components and/or the lack of necessary safety features, including but not limited to: a manual safety, a tabbed trigger safety, a de-cocker and/or a grip safety.

26.     For many years since the weapon was first introduced to the market in 2014, Sig Sauer has wantonly failed to recall the P320 despite knowing of scores of grievous wounds inflicted upon users and bystanders.

27.     For years before the subject incident giving rise to this action, Sig Sauer expressly represented that the weapon will not fire unless the user wants it to: "[w]e've designed safety elements into every necessary feature on this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to":

4



28.     Many U.S. law enforcement agencies, local police departments, military personnel at a commander's discretion, and private owners routinely carry pistols with a chambered round.

29.     Sig Sauer advertises that users can carry the P320 with a round chambered by annotating the P320's capacity in various configurations as "10 + 1," "12 + 1," etc.

30.     The "+ 1" represents a chambered round.

31.     When Sig Sauer designed and manufactured all its pistols, including the P320, Sig Sauer knew that law enforcement personnel, military personnel and private owners routinely carry pistols with a chambered round.  The P320 is the first striker-fired pistol[1] Sig Sauer has ever manufactured.

---

[1] A striker-fired pistol is different from the traditional "hammer-fired" pistol.  It contains no external hammer to be pulled back by the user; rather, it has an internal "striker" that is held back under spring pressure inside the gun, like a bow and arrow. The P320 is designed so that the rearward movement of the slide places the striker under significant spring tension, making it ready to fire once it is released. The striker is held back by the weapon's sear.  In the below illustrative photo of a typical striker-fired pistol the striker, in red, is held back by the sear, in blue.

32.     Sig Sauer assembled the P320 using the same frame from an earlier hammer-fired Sig Sauer model, the P250.

33.     While competing for a $580 million contract to supply the United States Army with a new service pistol in 2016, Sig Sauer's prototype P320s exhibited nearly 200 malfunctions during Army testing.  The Army demanded that Sig Sauer fix all problems associated with the prototype.

34.     The United States Army would not consider the P320 for purchase unless it had an external safety.

35.     Sig Sauer failed to make available to the public the P320 that injured Plaintiff in a form containing a manual safety, *or any external safety.*

36.     An external manual safety, at the time the subject gun was sold, was certainly technologically feasible for the P320.



37.     A properly functioning and active external manual safety, at the time the subject gun was sold, would preclude a properly functioning P320 from firing in an unintended fashion.

38.     Upon information and belief, all single action striker-fired pistol manufactured by companies other than Sig Sauer are equipped with some type of external safety: whether it is a thumb safety, tab trigger safety, grip safety, de-cocker, or hinge trigger.

39.     Upon information and belief, Sig Sauer manufactures the only single action striker-fired pistols on the market that are not equipped with any form of external safety.

40.     Since the P320's manufacture and distribution into the stream of commerce, Sig Sauer has expressly represented that the weapon possessed a "robust safety system":



41.     Indeed, Sig Sauer originally manufactured the P320 to include a tabbed trigger safety as an optional external safety for the P320.

42.     Despite their representations, Sig Sauer never made a tabbed trigger safety available as an option for the P320.[2]

---

[2] A tabbed-trigger safety is a small tab within the trigger which must be depressed in order for the entire trigger to be depressed, thus preventing incidental discharges.

43.     In fact, Sig Sauer's original design and manufacture of the P320 rendered the weapon unreasonably dangerous for its intended uses and for any foreseeable uses, including normal carrying, holstering, un-holstering, and/or handling.

44.     When Sig Sauer shipped P320s to dealers for sale to civilian consumers, Sig Sauer knew or should have known: a.) that the weapon was defective in its design and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses; and b.) that un-commanded discharges could occur in the ordinary course of using the weapon.

45.     The injury suffered by Plaintiff, and harm caused to many others, were the foreseeable result of Sig Sauer's own failure modes and effects criticality analysis ("FMECA") performed by Sig Sauer for both its internal use and analysis, and its FMECA analysis provided to the United States Military in or around 2016.

46.     Defendant was on notice of the risks of the P320's design.

47.     In 2016-17, the United State Military required that Sig Sauer conduct a failure modes effects and criticality analysis.

48.     The purpose of the FMECA was to assess the vulnerabilities of the P320 to certain health and safety risks associated with the use of the P320.

49.     The FMECA identified the first five risks associated with the use of the P320 as being unintended discharges.

50.     One of those five risks was the ***unintended trigger actuation by a foreign object.***

51.     The risk of unintended trigger actuation was that it could kill someone.

52.     In 2016 Sig Sauer was aware of incidents in which the P320 discharged due to unintended trigger actuation—a known risk from the FMECA analysis.

53.     At no time did Sig Sauer require that each P320 include at least one external safety.

54.     Prior to the introduction of the P320, every single action gun Sig Sauer sold had at least one external safety.



55.     For years after the P320 was introduced, Sig Sauer represented to the public in owner's manuals and sales materials that the P320 was double action.

56.     For years, the P320 Owner's Manual had multiple references to the fact that the P320 was double action, including "The following information applies to all P320 models: Double Action Striker fired system."

57.     For years, the P320 Owner's Manual stated: "the automatic striker assembly lock and double action trigger ensure safe carrying of the weapon and provide instant readiness *without actuating a manual safety."*

58.     Sig Sauer's engineer of the P320, Sean Toner, testified under oath that the P320 is double action.

59.     Sean Toner subsequently testified that his prior testimony the P320 was double action was false and that the P320 is a single action pistol.

60.     Sig Sauer's own hired expert, Derek Watkins, testified that the Sig Sauer P320 has been a true, striker fire, single action pistol from day one.

61.     Sean Toner, Sig Sauer's engineer of the P320, testified at trial that he could not think of any single action gun in the world that did not have an external safety besides Sig Sauer.

62.     Sig Sauer through its corporate designee has admitted to providing false statements to the public concerning the characteristics of the P320.

63.     Sig Sauer continued to sell P320's with no external safeties to consumers, even when Sig Sauer knew of the unreasonable risks and danger associated with unintended discharges due to the P320's design.

64.     In 2015, a Pennsylvania State Trooper and firearms instructor killed another trooper with his Sig Sauer pistol when it discharged without a trigger pull during safety training.

65.     In 2016, a tactical response training instructor near Sacramento dropped his Sig Sauer, firing a bullet into a student's truck.

66.     In February, 2016, a fully-holstered P320 discharged in its holster without the user touching the gun in Roscommon, Michigan, when the officer moved to exit the vehicle during a snowstorm.   The incident was captured on the Officer's body-worn camera.

67.     In 2016, the Surprise, Arizona, Police Department complained to Sig Sauer of two (2) separate incidents of P320s firing without trigger pulls.

68.     In October, 2016, a P320 fired un-commanded on retired NYPD Officer Thomas Frankenberry in South Carolina, severely injuring him. The spent casing did not eject.

69.     In November, 2016, a P320 fired un-commanded on an Officer in Holmes Beach, Florida, striking him in his leg.

70.     In 2017 in Michigan, a Sheriff's Deputy's Sig Sauer pistol discharged without a trigger pull, striking a schoolteacher in the neck.

71.     On January 5, 2017, a P320 shot a Stamford, Connecticut, SWAT team member, Vincent Sheperis, in his left knee when the pistol fell from a distance of less than three feet to the ground while fully holstered, refuting SIG SAUER's express representations that the weapon is drop safe, cannot fire without a trigger pull and does not require a safety to be drop safe.

72.     On February 28, 2017, a P320 discharged without the user pulling the trigger at the University of Cincinnati Police Department.

73.     On June 14, 2017, a P320 discharged without the user pulling the trigger in Wilsonville, Oregon.

74.     On June 20, 2017, a P320 discharged without the user pulling the trigger while in use by the Howell Township, New Jersey, Police Department.

75.     In June of 2017, Sig Sauer shipped approximately 800 P320s to the Loudoun County, Virginia, Sheriff's Department, privately assuring its leadership, Sheriff David Chapman, that the problems with the weapon would be fixed, but that for the time being it had to deal with the weapon as currently manufactured and designed.[3]

76.     On July 28, 2017, a P320 discharged without the user pulling the trigger in Tarrant County, Texas.

77.     On August 4, 2017, the Stamford SWAT team member, Vincent Sheperis, sued Sig Sauer in U.S. District Court in Connecticut for an un-commanded discharge of a commercial version of the P320 that shot him in his knee.

78.     Four days later, Sig Sauer's CEO released a statement stating: "there have been zero (0) reported drop-related P320 incidents in the U.S. Commercial market."

---

[3] As noted *infra*, both a non-upgraded and "upgraded" version of these P320s later fired un-commanded on and hit at least two Loudoun County deputy sheriffs in 2018 and 2019.

79.     This statement was false, in view of Sig Sauer's knowledge that Officer Sheperis in Connecticut had been shot by a drop fire some seven months earlier with the commercial version of the P320, and that several other un-commanded discharges of the P320 had occurred before that date.

80.     On August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320 pistol, stating that the pistol meets "rigorous testing protocols for global military and law enforcement agencies" and all "U.S. standards for safety."

81.     This statement was also false, as there are no federal government standards for gun safety, a fact known to Sig Sauer when it issued this press release.

82.     No federal agency oversees how firearms are designed or built. Firearms were expressly exempted by Congress from any federal regulation when Congress created the Consumer Product Safety Commission in 1972.

83.     Sig Sauer's "upgrade" program, which was presented to the public as purely optional, not urgent, and not mandatory, offered to make existing commercial versions of the P320 "better" by installing a much lighter trigger, an internal disconnect switch, and an improved sear to prevent un-commanded discharges.

84.     On August 9, 2017, the Police Chief of Morrow, Georgia, issued an emergency order removing the P320 from service.

85.     In October, 2017, a P320 discharged without the user pulling the trigger in Georgia when an officer fell to the ground in pursuit of a suspect. His weapon was holstered, but it fired simply when he struck the ground.

86.     On November 12, 2017, a P320 discharged without the user pulling the trigger in Dallas County, Texas.

87.     On February 2, 2018, a user  in Oklahoma was catastrophically injured while he removed a holster containing his P320 from his belt.

88.     On February 7, 2018, Loudoun County, Virginia, Deputy Sheriff Marcie Vadnais's P320 fired on her un-commanded in Virginia, causing catastrophic injury and ending her career. Upon CAT scanning her P320, it was found to have both a design and manufacturing defect: crossed sear springs that apply upward spring pressure to the sear to keep it from releasing the striker.

89.     Months later in April 2018, Sig Sauer issued a second "voluntary upgrade" notice to all users or owners of the P320, but still did not recall the weapon.

90.     In May 2018, civilian Gunter Walker reported to Sig Sauer that his P320 fired on him un-commanded when he placed the weapon down on his nightstand, shooting him through the palm of his left hand.

91.     In June 2018, a Williams County, Ohio, Officer reported that his P320 discharged twice in one moment as he merely attempted to move the slide backward. One round grazed the Officer's arm; the other blew through his patrol car's driver's side door.

92.     In May 2018, a Rancho Cucamonga, California, Officer reported that his P320 fired un-commanded merely while he was walking inside his department locker room; the casing of the round did not eject.

93.     In October 2018, a P320 fired un-commanded on Lieutenant Letrell Hayes in Georgia while he was holstering it, causing severe tunneling injuries to his right thigh and calf.

94.     In October 2018, retired Law Enforcement Officer Stephen Mayes' P320 fired un-commanded while seated in its holster, causing severe injury to his right leg.

95.    In December 2018, civilian Robert Lang's P320 fired on him un-commanded and caused serve tunneling wounds to his right leg.

96.    On May 19, 2019, the P320 of Lieutenant Thomas Ahern of the Cambridge, Massachusetts, SWAT team fired un-commanded inside a SWAT van with six other occupants while he was working a shift for the annual MayFair event near Harvard Square.

97.    The round struck a cellphone case on Ahern's left leg, deflected into a SWAT gear bag and came to rest in a ballistic helmet, narrowly missing everyone else in the van. The casing of the round did not eject. Lieutenant Ahern is a Sig Sauer certified armorer[4] on the P320.

98.    On July 23, 2019, a P320 fired un-commanded on Officer Walter Collete, Jr. of the Somerville, Massachusetts, Police Department hitting him in his leg and causing substantial injuries to his leg.

99.    In August 2019, Philadelphia Transit Officer Craig Jacklyn's P320 fired un-commanded while fully-holstered, nearly striking a bystander in the subway concourse. The incident was captured on video, and the officer was returned to duty the next day.

100.    The transit authority replaced all Sig Sauer P320s, and later fully exonerated the officer of any alleged wrongdoing in view of the content of the videotape of the incident showing that it fired without a trigger pull. The officer, Craig Jacklyn, later stated:

> This weapon is a hazard. I actually spoke with a lawyer for my situation. Although no one was hurt...someone could have been killed. I'm angry that I was put in a potentially life altering position with a product deemed "safe" by its manufacturer. The fact that officers are carrying this weapon on the job and at home around family thinking it's safe even while resting in its holster has me very angry. Everything that I've told you is documented through 2 Investigative Services. Philadelphia Police Firearms Investigative Unit/ Officer Involved

---

[4] According to Sig Sauer documents, "[t]he SIG SAUER factory armorer certification enables the agency armorer or individual user to completely disassemble, inspect, service, and re-assemble associated weapon systems without voiding the factory warranty. Proper and routine weapon maintenance and inspection of a firearm are essential to ensure maximum reliability. Factory armorer courses at SIG SAUER Academy certify agency armorers or individuals to maintain, inspect, service, and repair selected SIG SAUER firearms while preserving the factory warranty. Upon successful completion, armorers will fully understand each firearm and be factory-certified for a period of three years." https://www.Sig Sauersaueracademy.com/course/armorer-certification

Shooting Incident Unit and SEPTA Transit Police Criminal Investigations Unit. There is station video footage/ body worn camera footage as well.

101.    On September 3, 2019, another P320 in use by the Loudoun County Virginia's Sheriff's Office fired un-commanded on another Loudoun County Deputy Sheriff, Carl Costello, hitting his leg.

102.    On October 10, 2019, Officer Jacques Desrosiers, also of the Cambridge, Massachusetts, Police Department, was shot by his P320 without him pulling the trigger. The round caused massive and life-changing injuries to Officer Desrosiers. The spent casing of the round did not eject.

103.    On October 11, 2019, a P320 fired un-commanded on Veterans Affairs Police Officer Frank J. Kneski, striking him beneath his lower back as he was un-holstering the weapon. Upon inspection it was found that the spent casing did not eject.

104.    On November 9, 2019, a P320 fired un-commanded on Officer Matthew Gardette of the Manteca, California, Police Department as he was getting ready for work. As he merely attempted to place and fasten his duty belt around his waist, the P320 discharged inside the holster.

105.    On December 2, 2019, a P320 fired un-commanded while in the possession of Detective David Albert, also of the Cambridge, Massachusetts, Police Department, as he was in the process of putting his duty belt on.

106.    Upon information and belief, employees at Sig Sauer's own training academy in New Hampshire have admitted to un-commanded discharges causing injury in both 2016 and 2017.

107.    On January 1, 2020, Colorado resident, Brian Tennant, was injured when his fully holstered P320 discharged without him touching the trigger.

108. On February 15, 2020, Pasco County Florida Sheriff's Deputy David Duff was injured when his P320 discharged without him pulling the trigger while the gun was in its holster on his duty belt.

109. On February 27, 2020, Tampa Police Department Reserve Officer Howard Northrop was severely and permanently injured when his service-issued P320 discharged without his pulling the trigger, while the gun remained inside his service-issued holster.

110. On March 31, 2020, Michigan resident, Anthony Buck, was injured when his P320 unintentionally discharged as he holstered the pistol.

111. On April 15, 2020, Yakima, Washington, Police Officer Nathan Henyan was injured when his P320 discharged from within its holster without him pulling the trigger.

112. On June 19, 2020, Army veteran George Abrahams was injured when his P320 discharged without him pulling the trigger.

113. At the time of Mr. Abrahams' incident, his P320 was contained within the holster that came in the box with his gun, which he kept in his pants pocket.

114. On July 14, 2020, Milwaukee Police officer Adam Maritato was injured when his partner's duty-issued P320 discharged from within its holster while the two were attempting to detain a suspect.

115. On July 27, 2020, ICE Agent Joseph Halase was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

116. In 2020, a Wyoming Highway Patrol officer experienced an unintentional discharge, leading the Wyoming Highway Patrol to abandon the P320 as its standard duty weapon.

117.     On September 21, 2020, a P320 fired un-commanded while in the possession of Deportation Officer Keith Slatowski of Immigration and Customs Enforcement during a training exercise in New Castle, Delaware.

118.     On November 9, 2020, Tampa Police Officer Jerry Wyche was injured when his holstered P320 discharged without him pulling the trigger as he was getting out of his police vehicle.

119.     On December 8, 2020, ICE Agent Catherine Chargualaf was injured when her P320 discharged from within its holster without her pulling the trigger during a training exercise.

120.     On January 23, 2021, civilian Timothy Davis was injured when his Sig Sauer P320 X-Carry discharged in its holster without a trigger pull.

121.     On April 1, 2021, ICE Agent Fernando Armendariz was injured when his duty-issued P320 discharged without his finger touching the trigger while he was in the process of holstering the pistol.

122.     On May 12, 2021, Department of Homeland Security Agent Amy Hendel was injured when her P320 discharged without her pulling the trigger during a training exercise.

123.     On May 17, 2021, Metro Transit Police officer, Erin Cooper, was injured when her P320 discharged while she put on her duty belt containing her holstered P320.  Officer Cooper never touched the P320's trigger and did not intend to fire the gun.

124.     On June 2, 2021, Troy, New York, Police Officer Michael Colwell suffered permanent injuries when his P320 discharged in his holster during a training exercise while his hands were not touching the gun.

125.     On June 5, 2021, Texas resident, William Campbell, was injured when his P320 unintentionally discharged as he racked the slide.

126.    On June 15, 2021, Massachusetts resident Kyla Ellis was injured when her P320 discharged without her pulling the trigger while it was in its holster.

127.    On July 31, 2021, Richmond County police officer, Timothy Rzasa, was injured when his P320 discharged without him pulling the trigger as he holstered the pistol.

128.    On August 18, 2021, Richmond County, Georgia, Sheriff's Deputy James Garth was injured when his P320 discharged without him pulling the trigger while he was holstering the weapon.

129.    On October 11, 2021, Florida resident Stephen Fernandez was injured while participating in the National Park Service Seasonal Law Enforcement Academy when his P320 unintentionally discharged as he attempted to remove the pistol from its holster. Fernandez never touched the P320's trigger and did not intend to fire the gun.

130.    On November 2, 2021, Florida resident Michael Parker was injured when his P320 discharged without him pulling the trigger while he was removing the fully holstered P320 from his pocket.

131.    On November 29, 2021, Atlantic County Prosecutor's Office Detective James Scoppa suffered severe tinnitus when his holstered P320 discharged without him pulling the trigger while he was inside of his car.

132.    On December 5, 2021, ICE Agent Mary Doffeny suffered severe emotional harm when her duty-issued P320 discharged from within a dedicated compartment in her purse.

133.    Ms. Doffeny' s incident was caught on video, which clearly shows the gun going off without her pulling the trigger.

134.    On January 15, 2022, Connecticut resident Zachary Brown was injured when his P320 discharged from within its holster without Mr. Brown pulling the trigger while he was attempting to remove the holster from his pants.

135.    On February 7, 2022, Honesdale, Pennsylvania, Police Officer Donald Thatcher's P320 discharged from its holster while he was exiting his car.

136.    Officer Thatcher's incident was captured on video, which clearly shows that Officer Thatcher's hands were not touching his holster at the time the P320 discharged.

137.    Following this incident, the Honesdale, Pennsylvania, Police Department pulled all P320s out of service and sued Sig Sauer for a refund of the firearms.

138.    On February 12, 2022, former Navy Small Arms Instructor Dionicio Delgado was injured when his P320 discharged from within its holster without him pulling the trigger.

139.    On February 26, 2022, Texas resident Juan Duran was injured when his P320 discharged without him pulling the trigger while it was in his holster.

140.    On March 28, 2022, Houston, Texas, Police Sergeant Marvin Reyes's P320 discharged from its holster while he was entering his car.

141.    Sergeant Reyes' incident was captured on video, which unmistakably shows that Sergeant Reyes's hands were reaching into his truck and not near his holstered P320 at the time it discharged visible below.



*Officer Marvin Reyes, Houston, TX*
*P320 discharging in its holster*

142.    On April 4, 2022, Georgia prosecutor Matthew Breedon was injured when his P320 discharged without him pulling the trigger while he was in the process of removing it from his holster.

143.    On May 25, 2022, former Georgia correctional officer and former Monticello, Georgia, police officer Dwight Jackson was injured when his holstered P320 discharged without him pulling the trigger.

144.    On September 10, 2022, a Milwaukee Police Officer's holstered P320 discharged while the officer was attempting to detain a suspect.

145.    Following this incident, the third in as many years involving a Milwaukee Police Officer, the Milwaukee Police Association filed a lawsuit against the City of Milwaukee to have the gun removed from service.

146.    In response to the incidents of Milwaukee Police Officers being injured by the P320, Milwaukee Police Chief Jeffrey Norman announced on October 31, 2022, that the

Milwaukee Police Department would replace every single P320 in its arsenal with pistols manufactured by one of Sig Sauer's competitors.

147.    On October 19, 2022, New Jersey resident Nicola Bevacqua was injured when his P320 discharged when he racked the slide. Bevacqua did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

148.    On November 7, 2022, Oklahoma resident William Clegg was injured when his P320 discharged from within its holster after making contact with a small wooden paddle.

149.    On March 27, 2022, Florida resident Cordell Hamilton was injured when his P320 discharged when he holstered the pistol.  Hamilton did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

150.    On April 14, 2022, Minnesota resident Christian Wuollet was injured when his P320 discharged without him pulling the trigger as he holstered the pistol.

151.    On July 19, 2022, ICE Agent, John McArtor, was injured when his P320 unintentionally discharged when he holstered the pistol. Agent McArtor never touched the trigger or intended to fire the P320.

152.    On September 10, 2022, Milwaukee Police Department Officer Laskey-Castle was injured when his partner Officer Lee's fully holstered P320 discharged while performing a crime scene investigation. Officer Lee never touched the trigger or intended to fire the P320.

153.    On October 4, 2022, Nevada resident, Wendell Cuasito, was injured when his P320 unintentionally discharged. Cuasito did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

154.    On October 18, 2022, Puerto Rico State Police Officer, Melvin Rivera, was injured when his holstered P320 discharged without him pulling the trigger while the pistol was in his waistband.

155.    On November 10, 2022, Texas resident, Rodney Gaston, was injured when his P320 discharged while it was in his right pocket as he walked in Houston, Texas.  Gaston never touched the trigger or intended to fire the P320.

156.    On November 13, 2022, United States Army firearms instructor, Cody Higgins, was injured when his P320 discharged without him pulling the trigger when he holstered the pistol.

157.    On November 16, 2022, Puerto Rico State Police Officer, Johnny Davis, was injured when his holstered P320 discharged without him pulling the trigger when he adjusted his waistband.

158.    On November 26, 2022, Arkansas resident, Paulo Jacuzzi, was injured when his P320 unintentionally discharged as he racked the slide. Jacuzzi did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

159.    On November 29, 2022, ICE Agent, Russell Dykema, was injured when his holstered P320 discharged without him pulling the trigger as he exited his vehicle.

160.    On January 7, 2023, Montana resident, Michael Lingo, was injured when his P320 unintentionally discharged while at a gun range. Lingo did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

161.    On January 24, 2023, Virginia State Police Officer Marcos Hernandez was injured when his holstered P320 discharged as he walked into his office building.  Officer Hernandez did not place his finger onto the trigger within the trigger guard and did not intend to fire the gun.

162.    On July 24, 2023, Officer Daniel Witts P320 discharged while in its holster without him touching the gun as his arms were wrapped around a suspect's legs.  This incident was captured on security camera and body camera, showing his hands nowhere near the gun at the time of discharge.



***Officer Daniel Witts, Montville, CT***
***P320 discharging in its holster***

163.    Between 2015-2022, there have been at least *nine* incidents where an Oklahoma Highway Patrol Officer had a P320 discharge when the officer did not pull the trigger.

164.    Internal documents from Immigration Customs Enforcement provide that unintended discharges skyrocketed when it switched its primary weapon from a Glock to the P320, with the P320 accounting for a nearly ***500% increase*** in unintended discharges.

165.    The unintended discharges involving the P320 have not showed any signs of abating because Sig Sauer has done nothing to address the lack of external safeties on the gun.

166.    On May 9, 2024, in La Grange, Texas, Officer Currington was shot by his holstered P320 duty pistol.  The shot pierced his leg and nearly caused him to bleed to death.  He

was found, barely conscious, with his P320 secured in its retention holster and a spent shell casing in the chamber.

167.    On September 20, 2024, in Marble Falls, Texas, a school resource officer, Hunter Galley, was preparing to work the homecoming football game at Mustang Stadium when his holstered P320 discharged while he was standing outside of the passenger side of his vehicle without his touching or manipulating the gun.  He was shot in the leg.

168.    Sig Sauer is aware of other claims of unintended discharges involving the P320 beyond those identified above.

169.    As of the date of this Complaint, Sig Sauer has been aware of approximately 350 reports or claims of P320 unintended discharges.

170.    As of the date of this Complaint, Sig Sauer has been aware of claims that P320 unintended discharges have killed users.

171.    As of the date of this Complaint, Sig Sauer has been aware of more unintended discharges of Sig Sauer P320s than any other gun it makes since the time the P320 first went to market.

172.    To date, Sig Sauer has never issued a mandatory recall of the P320 and continues to sell the P320, putting profits above the health and safety of its users.

## **PLAINTIFF'S INCIDENT**

173.    On February 7, 2023, Plaintiff was working in the course of his business as a tow truck operator.

174.    On that date, Plaintiff intended to transport an unoccupied vehicle from a location in Birmingham, Alabama, to the owner's location in the same city.

175.     In the course of preparing the vehicle for transport, Plaintiff discovered a Sig Sauer P320 on the seat of that unoccupied vehicle.

176.     Plaintiff took the P320 from that vehicle and secured it next to the center console in his tow truck to protect the gun that would ultimately be in a tow yard.

177.     Plaintiff proceeded to transport the unoccupied vehicle with his tow truck.

178.     As Plaintiff drove the tow truck, the P320 discharged uncommanded.

179.     At the time of discharge, Plaintiff was not touching the P320, and his finger did not enter the trigger guard.

180.     The bullet from the unintended P320 discharge struck Plaintiff in his right calf.

181.     As a direct and proximate result of Defendant Sig Sauer's wrongful acts, negligence, gross negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff suffered extreme physical pain, psychological trauma, scarring and economic damages.

182.     As a direct and proximate result of Defendant Sig Sauer's wrongful acts, negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff has in the past and is reasonably likely to require medicines, medical care and treatment. Plaintiff has in the past and may in the future continue to be compelled to expend monies and incur further obligations for such medical and/or psychological care and treatment. Plaintiff has in the past and may in the future continue to suffer agonizing loss, psychological pain and suffering, and extraordinary emotional harm.

183.     As a direct and proximate result of Defendant Sig Sauer's wrongful acts, negligence, carelessness, recklessness, strict liability and/or other liability producing conduct, Plaintiff has in the past and may in the future continue to be disabled from performing his usual

duties, occupations, and avocations, and Plaintiff has suffered and will continue to suffer a loss of earnings and earning potential.

## COUNT I – NEGLIGENCE
### PLAINTIFF V. SIG SAUER

184.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

185.    At all relevant times, Sig Sauer owed Plaintiff the duty to design the P320 weapon in such a manner and with the exercise of reasonable care before selling the gun and placing it into the stream of commerce.

186.    At all relevant times, Sig Sauer owed Plaintiff the duty to manufacture, assemble, inspect and/or test its P320s in such a manner and with the exercise of reasonable care, so as to prevent it from firing without a user commanding it to by a trigger pull, before selling the gun and placing it into the stream of commerce.

187.    Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of its own internal research and testing, including its failure modes and effects criticality analysis ("FMECA"), which identified as a deadly risk the likelihood of unintended trigger actuation by a foreign object in 2016 or earlier.

188.    Sig Sauer also knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of formal and informal reports and video evidence from civilian, law enforcement and military users, and formal claims and lawsuits arising from substantially similar incidents, internal testing and research, industry publications and research, and other sources of information to be developed in discovery.

189.    Sig Sauer breached the above-cited duties in various ways, including but not limited

to, one or more of the following negligent acts:

    i.     By failing to use due care in designing and manufacturing the P320's firing and striker assembly to prevent un-commanded discharges;

    ii.     By failing to use due care in designing the P320, failing to incorporate a manual external safety, tabbed trigger safety, or grip safety to prevent unintended discharges;

    iii.     By failing to use due care in designing and manufacturing the P320's internal components, including its sear, and by omitting a mechanical disconnect switch, to prevent un-commanded discharges;

    iv.     By failing to issue a mandatory recall of the P320 as Sig Sauer has done in the past with other defective products;

    v.     By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded as described above;

    vi.     By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge un-commanded while in the possession of Sig Sauer, and during which times employees, servants or agents of Sig Sauer had an opportunity to inspect, service and work on the gun;

    vii.     By misrepresenting the dangers and hazards posed by the gun;

    viii.     By failing to design a firearm that would be safe for all users to operate under ordinary circumstances;

    ix.     By negligently misrepresenting that the P320 is safe when carried with a round in the chamber;

    x.     By including a defective and improper holster in the original packaging with the gun;

    xi.     By failing to incorporate safeties which were standard among all of the P320s' competitors; and

xii.   Other negligent acts and omissions to be developed in the course of discovery.

190.   Sig Sauer knew, or should have known, that exposing individuals to the dangerous and defective and hazardous conditions existing in the gun would or could give rise to serious bodily injuries, up to and including death.

191.   The gun's defective condition was not visible, and Plaintiff was not capable of realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

192.   Sig Sauer's negligence, as alleged in this Count, directly and proximately caused the unintended discharge and Plaintiff's injuries.

193.   As a direct and proximate result of the negligence set forth in this Count, Plaintiff suffered severe physical injury, mental anguish, inconvenience, loss of the capacity for the enjoyment of life, physical deformity and handicap and embarrassment associated with the same, loss of earnings and earning capacity, incurred medical, attendant care and life care expenses for his care and treatment.  These injuries are either permanent or continuing in their nature, and Plaintiff will suffer such losses and impairments in the future.  Plaintiff is also entitled to enhanced compensatory damages based on the wanton, malicious and oppressive nature of Sig Sauer's acts and omissions as alleged herein.

194.   **WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

## COUNT II - STRICT PRODUCT LIABILITY
### PLAINTIFF V. SIG SAUER

195.    Plaintiff re-adopts and re-alleges all paragraphs of this pleading as if fully set forth herein.

196.    Sig Sauer, by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers and/or distributors, is strictly liable under §402(A) of the Restatement (Second) of Torts because:

   a.   Sig Sauer is engaged in the regular business of designing, assembling, manufacturing, selling, supplying, distributing, and/or placing into the stream of commerce firearms, including the P320 that injured Plaintiff;

   b.   The product involved in the subject incident was marketed and/or placed in the general stream of commerce by Sig Sauer;

   c.   The product was expected to and did reach users without substantial change in the condition in which it was designed, assembled, manufactured, sold, supplied, distributed and/or placed into the stream of commerce;

   d.   The product was designed, assembled, manufactured, sold, supplied, distributed, and/or placed into the stream of commerce in the defective condition for the reasons set forth above.

197.    The P320 was in a defective condition, as a reasonable person would conclude that the probability and seriousness of the harm caused by the P320 outweighed the burden or costs of taking precautions.

198.    Sig Sauer breached its duties, by and through their agents, servants, workers and/or employees, and was jointly and severally careless, negligent, grossly negligent and/or reckless in the performance of its obligations.

199.    The defective condition of the P320 caused Plaintiff's injuries.

200.    Sig Sauer is therefore strictly liable to Plaintiff.

**WHEREFORE**, Plaintiff demands judgment in his favor and against Defendant for compensatory and enhanced compensatory damages, together with lawful interest, attorneys' fees, costs of suit, and all other claims available by law.

Respectfully submitted,

**SALTZ MONGELUZZI & BENDESKY P.C.**

Date:  May 20, 2025        By:        */s/ Robert W. Zimmerman*
                                              ROBERT W. ZIMMERMAN, PA Bar #208410
                                              RYAN D. HURD, PA Bar #205955
                                              SAMUEL A. HAAZ, PA Bar #314507
                                              *Pro Hac Vice*
                                              One Liberty Place, 52nd Floor
                                              1650 Market Street
                                              Philadelphia, PA 19103
                                              (215) 496-8282
                                              rzimmerman@smbb.com
                                              rhurd@smbb.com
                                              shaa@smbb.com

                                                 and

**DOUGLAS, LEONARD & GARVEY, P.C.**

Date:  May 20, 2025        By:        */s/ Benjamin T King*
                                              BENJAMIN T. KING, NH Bar #12888
                                              14 South Street, Suite 5
                                              Concord, NH 03301
                                              (603) 224-1988
                                              benjamin@nhlawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served this date upon all counsel of record via the ECF filing system.

/s/ Benjamin T. King
Benjamin T. King